SCOTT S. KRIEBAUM,           )
                                   )
       **Plaintiff,**           )
                                   )
     **vs.**                   )        **Case No. 4:05CV2392MLM**
                                   )
**JO ANNE B. BARHNART**         )
**Commissioner of Social Security,**    )
                                   )
       **Defendant.**         )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne

B. Barnhart ("Defendant") denying the application of Scott S. Kriebaum ("Plaintiff") for

Supplemental Security Income ("SSI") and under Title XVI of the Social Security Act, 42 U.S.C. §§

1381 et seq. and Social Security disability benefits under Title II of the Social Security Act, 42 U.S.C.

§§ 401 et seq. Plaintiff has filed a brief in support of his Complaint. Doc. 13. Defendant has filed

a brief in support of the Answer. Doc. 14. The parties have consented to the jurisdiction of the

undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c)(1). Doc. 5.

**I.**
**PROCEDURAL HISTORY**

On October 30, 2003, Plaintiff filed applications for disability benefits. (Tr. 13). Plaintiff's

applications were initially denied. (Tr. 36-40, 42, 70-73).[1] Plaintiff filed a request for a hearing,

---

[1]     Missouri is one of several test states participating in modifications of the disability
determination procedures which apply in this case. 20 C.F.R. §§ 404.906 and 4040.966 (2002).
These modifications include, among other things, the elimination of the reconsideration step and
at times, the elimination of the Appeals Council review step in the administrative appeals process.
See id. Therefore, Plaintiff's appeal in this case proceeded directly from her initial denial of

which was held before Administrative Law Judge ("ALJ") J. Pappenfus on December 22, 2004. (Tr. 13). On March 25, 2005, the ALJ issued a decision which was unfavorable to Plaintiff. (Tr. 13-23). On October 27, 2005, after considering additional evidence, the Appeals Council denied Plaintiff's request for review. (Tr. 3-5, 248-49). Thus, the decision of the ALJ became the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that at the time of the hearing he was 44 years old; that he is divorced; that the day prior to the hearing he moved into his brother's house; that prior to living with his brother he lived with his mother; that until three years prior to the hearing his six year old child lived with him; that he and his mother were the care providers for this child; that when living with his mother he did not do any of the household work; and that his mother did the cooking, laundry, and shopping. (Tr. 254-55, 262, 279-80).

Plaintiff testified that he has a high school education and one year of college; that he was in the military for fifteen years and ten months; and that he attended technical schools. Plaintiff further testified that while in the military he worked on flight simulators which job required three people to lift transmitters weighing 300 pounds and antennas weighing 120 pounds. (Tr. 256-57, 271). Plaintiff testified that he worked at Rawlings as a factory worker; and that this job required lifting, stooping, walking all day, and his being on his feet for ninety-five per cent of the day. (Tr. 257-58, 264). Plaintiff said he worked as a painter in 1997 to 1998; that while working as a painter he fell and broke his heel; and that he also worked as a roofer. (Tr. 258, 265-66).

---

benefits to the administrative law judge level.

Plaintiff indicated he was alleging a disabling impairment due to pain in his foot. (Tr. 260). Plaintiff's attorney said that Plaintiff last worked in September 2003 and that Plaintiff is alleging a disability onset date of September 1, 2003. (Tr. 259). Plaintiff testified that he applied for and received unemployment compensation benefits in the fourth quarter of 2003 and the first quarter of 2004 and that he settled a worker's compensation claim in February 2003. (Tr. 260, 284-85).

Plaintiff testified that he shot himself in the foot the day after Thanksgiving 2004, while squirrel hunting with his son. (Tr. 261). Plaintiff testified that in January 2002 he fell from a ladder and broke his heel, requiring ten screws and a plate; and that he required more surgery to repair his heel; that after surgery, Plaintiff attended physical therapy three times a week; and that physical therapy did not provide him any sort of relief or cure his pain. (Tr. 273-74). Plaintiff said that the gap in his medical care between 2002 and 2004 is due to his returning to work during this period; that in April 2004 he had a second surgery to fuse the ankle bone to the heel bone; that this surgery was successful; and that he was having pain from a screw in his heel and would require a third surgery to remove the screw. (Tr. 273-74). Plaintiff testified that his pain level on the day of the hearing was six out of ten; that once a week it was seven or eight out of ten; that he walks with a cane; that the cane is not medically prescribed; and that he can only walk about a block and stand for fifteen minutes before he has to sit down due to pain. (Tr. 276-77). Plaintiff said that he tries to elevate his foot as much as possible. (Tr. 278-79). Plaintiff also testified he was taking Oxyproxone off and on; that he previously took Vicodin and Percocet and Vioxx; that he had no side effects from these drugs; and that he was alleging no mental impairments. (Tr. 261).

Plaintiff testified that he does not believe that he can work any of his prior jobs because they required him to be on his feet. (Tr. 281-82).

# III.
## MEDICAL and OTHER RECORDS

A report from Imaging Services at St. John's Mercy Hospital dated January 30, 2002, states that Plaintiff's diagnosis was a "fracture of the right calcaneus"; that it was comminuted and involved both anterior and posterior components of the calcaneus on the lateral view; and that no other fracture was identified. (Tr. 229).

Records of St. John's Mercy Hospital reflect that Plaintiff was admitted on February 6, 2002, for an open reduction of a right calcaneal fracture. (Tr. 226). Records further reflect that on February 12, 2002, Dean A. Lusardi, M.D., performed an open reduction internal fixation of right calcaneus fracture. Dr. Lusardi reported thirteen days prior Plaintiff fell from a height of six to eight feet; that he placed two screws through the lateral fragment into the sustentaculum tali; that there was excellent reduction of the posterior facet of the calcaneus; that he placed three screws in the posterior fragment, two in the central fragment, and two in the anterior fragment. Dr. Lusardi noted the fracture and hardware were in good position. (Tr. 233-34).

On February 27, 2002, Dr. Lusardi noted Plaintiff "appear[ed] to have a little bit of necrosis at the corners of the repair." (Tr. 168). Dr. Lusardi noted that there were no fluctuants; that sensation was intact in the superficial peroneal, deep peroneal, and tibial saphenouse and sural nerve distribution; that dorsalis pedis and posterior tibialis pulses were intact; and that Plaintiff had some tenderness. Dr. Lusardi placed Plaintiff in a cast boot, prescribed Percocet, and scheduled Plaintiff for follow up in one week. (Tr. 168).

Dr. Lusardi's records of March 6, 2002 note marginal necrosis and state that axial, lateral and Broden's view x-rays showed Plaintiff's fracture was well aligned on all three views. Dr. Lusardi prescribed Percocet on this date. (Tr. 167).

On March 13, 2002, Dr. Lusardi noted that the necrosis in the corner of Plaintiff's wound was starting to separate away and that it did "not appear to be full thickness." (Tr. 167). Dr. Lusardi reported on this date that Plaintiff should continue soaking his foot; that Plaintiff should begin to work on a range of motion of his ankle and foot; and that Plaintiff was prescribed Darvocet. (Tr. 167).

Dr. Lusardi's notes of March 27, 2002, state that the calcaneus fracture appeared to be healed and in good position; that Plaintiff was told "to be non-weight bearing on [the affected] limb"; that Plaintiff was referred to Dr. Chris Paletta, a plastic surgeon, for necrosis and black eschar in the corner of his wound; and that Plaintiff was prescribed Darvocet. (Tr. 166).

Records of Pro Rehab reflect that Plaintiff began physical therapy on May 21, 2002 and that Plaintiff reported his pain as being 4/10 and ranging from 2/10 to 7/10; that pain and swelling increased with walking for extended periods; that he had decreased swelling with use of contrast bath; and that he was to wean himself off the boot. Notes of this date reflect that Plaintiff had decreased composite digital flexion on right foot as compared to left, tenderness along the peri-incision area, and tenderness diffusely along the medial aspect of the right ankle inferior to the malleous; and that Plaintiff was scheduled to receive therapy three times per week for four weeks. (Tr. 196).

Physical therapy notes of May 22, 2002 reflect that Plaintiff had decreased pain in his ankle since his last visit; that Plaintiff reported pain between the toes along the lateral aspect of his foot and increased pain in his achilles tendon region; that Plaintiff had difficulty moving his ankle into inversion and eversion; and that Plaintiff tolerated all activities in the clinic without reporting increased pain. (Tr. 195).

Physical therapy notes of May 24, 2002 reflect that Plaintiff's session was canceled because he used a bike for transportation and it was raining. (Tr. 195).

Physical therapy notes of May 28, 2002, reflect that Plaintiff "did not show" for therapy. Notes of May 29, 2002 reflect that Plaintiff reported that he missed his session due to the stomach flu; that he rode on the Katy Trail from Defiance to Washington over the weekend; that he was going arrowhead hunting; that when arrowhead hunting he would not be wearing his boot "but would wearing a hiking boot"; and that he had not gotten inserts. Notes of this date further state that Plaintiff ambulated in the clinic with the boot on his affected side and that he tolerated all activities in the clinic without reporting increased pain. (Tr. 195).

Physical therapy notes of May 30, 2002 reflect that Plaintiff reported increased soreness in his ankle; that he wore a hiking boot while arrowhead hunting after his last visit; and that his ankle felt stable. Notes of this date state that Plaintiff tolerated all activities in the clinic without reporting increased pain. (Tr. 195).

Physical therapy notes of May 31, 2002, reflect that Plaintiff reported his ankle was still sore; that he could ambulate in clinic without boot with significant gait on the affected side marked by decreased stance time on that side; and the he tolerated all activities in the clinic without reporting increased pain. (Tr. 194).

On June 3, 2002, Plaintiff reported his pain to be 2/10. (Tr. 194). He reported pain in his achilles tendon region and anterior talocural joint when he coughs. (Tr. 194). Plaintiff tolerated all activities in the clinic without reporting increased pain. (Tr. 194).

Physical therapy notes of June 5, 2002 reflect that Plaintiff reported going arrowhead hunting in farmer's fields without reporting significant increase in pain; that Plaintiff continued to ambulate with antalgic gait on the affected side, somewhat decreased with verbal cues; and that he tolerated all activities in the clinic without reporting increased pain. (Tr. 193).

Physical therapy notes of June 7, 2002 reflect that Plaintiff reported increased soreness in ankle due to his not receiving pain medication; that his pain was 4/10; and that he received shoe inserts and had increased discomfort when walking with them. Notes of this date state that Plaintiff tolerated all activities in the clinic without reporting increased pain. (Tr. 191).

Records of ProRehab further reflect that Plaintiff attended physical therapy on June 10, 12, and 14, 2002, and that he did not attend on June 24, 2002. (Tr. 190-91). Records further reflect that he attended physical therapy on June 26, 2002, and that on this date he reported his pain as 1/10; that his ankle was "back to normal since my flare of swelling"; that he was "going to tell the doc I gotta go back to work, cause I can't afford not to"; and that he no significant pain in his right Achilles tendon. (Tr. 190).

Records of ProRehab reflect that Plaintiff attended physical therapy on June 28, 2002, and that on August 2, 2002, Plaintiff's therapy was cancelled because no further orders were received. (Tr. 188).

Dr. Lusardi's records reflect that he saw Plaintiff on September 5, 2002; that Plaintiff had seen orthopedic surgeon Gary Schmidt for the necrosis and black eschar; that the necrosis and black eschar healed on its own; and that Plaintiff lost his insurance and was no longer able to see Dr. Schmidt and wanted to return to see Dr. Lusardi. Dr. Lusardi reported tenderness in Plaintiff's subtalar joint and decreased subtalar motion; that Plaintiff had "fairly chronic and persistent pain"; that Dr. Lusardi recommended subtalar arthrodesis; and that Plaintiff was to follow up with Dr. Lusardi. (Tr. 165).

Progress notes dated September 30, 2003, reflect that Plaintiff presented complaining of pain in the right foot for three days and that he denied any recent falls or injury. Notes further state that Plaintiff said that he was concerned that screws from his prior surgery might be loose; that he did not follow up regarding his foot "due to it['s being] a workman's comp injury and [he] ha[d] to settle";

that he had pain of 6/10 and occasional swelling; and that he was working at a factory job where he stood all day. Notes of this date state that X-rays of Plaintiff's ankle/foot showed "internal fixation of old cacaneus fracture," fusion of the talocalcaneal, and "no abnormality." Notes further state that Plaintiff was released from work September 30 and 31, 2002 and that he could return to work on October 2, 2003. Notes also state that Plaintiff was to keep weight off of and elevate his foot and that he should rest. (Tr. 175-77, 185-186)

Records of Jack C. Tippett, M.D., of the Forest Park Medical Clinic, dated November 25, 2003, reflect that Plaintiff was seen for pain in his right heel, back pain and weakness in his right arm; that Plaintiff complained of constant pain in his right heel which was "somewhat" aggravated by walking; that Plaintiff had a slight limp; that Plaintiff did not require external assistance walking; and that Plaintiff was able to briefly stand on his toes and heels, squat and return to a standing position, bend over and touch his toes and return upright, and could get off the examining table unassisted. Dr. Tippett noted the scar from Plaintiff's surgery and a slightly widened calcaneus; that Plaintiff's right foot was dorsi flexed 10 degrees and plantar flexed normally and that there was a moderate loss of inversion and eversion of the right foot. (Tr. 170-71).

A Progress Note dated December 1, 2003, states that Plaintiff said that he was trying to cut down smoking; that he smoked approximately one pack of cigarettes a day; and that he drank alcohol two to four times a month and typically consumes 3 to 4 drinks each time. (Tr. 180).

On a form dated December 6, 2003, Plaintiff reported that he could not work due to a broken heel and soreness in his foot; that he was in constant pain which was worse when standing; that he used a cane when his pain is severe; that he could wash laundry, wash dishes, make beds, iron, vacuum, take out trash, and perform home repairs and car maintenance; and that he could not mow the lawn, rake leaves, and garden. (Tr. 132).

On January 12, 2004, L. Masek, Senior Counselor, completed a physical residual functional capacity ("RFC") assessment of Plaintiff which states that Plaintiff has no exertional limitations; that he could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for at least two hours in an eight hour day, sit for six hours in an eight hour day and was limited in pushing and/or pulling with his lower extremities; that Plaintiff has postural limitations of occasionally climbing and occasionally balancing; that Plaintiff should avoid concentrated exposure to extreme cold, moderate exposure to vibration, and moderate exposure to hazards; that Plaintiff is limited to sedentary activity; that he could have improved mobility and pain relief with arthrodesis and that he has been unable to pursue this; that it is difficult for Plaintiff to walk or stand for more than two hours a day due to pain with extended walking or standing; and that he has limited use of his right foot and ankle for foot controls as this pressure would exacerbate his pain. (Tr. 120-27).

Progress notes dated February 12, 2004, from David Chalk, M.D., who saw Plaintiff for an orthopedic consultation, state that a study of Plaintiff's ankle showed that the joint outline was normal and that there was slight edema of the right ankle joint. Notes of this date state that Plaintiff experienced pain with dorsal flexion of the ankle and when he was full weight bearing on the right cacaneus and that a CT scan of the right foot was ordered to determine whether there is healing at the site. (Tr. 213).

Medical records of February 17, 2004 reflect that Plaintiff needed a second opinion regarding his right heel and foot and that physical examination showed that Plaintiff's heel was "not excessively widened and that there was minimal swelling in the ankle. (Tr. 216). Notes of this date also state that there was "palpable tenderness primarily in the area of the sinus tarsi, less so over the hardware itself" and that Plaintiff had probable post traumatic arthritis of the subtalar joint. Plaintiff was

injected with triamcinolone for diagnostic and therapeutic purposes and he was told to should return in six weeks. (Tr. 216).

A radiology report dated March 5, 2004, states that a CT scan of Plaintiff's right ankle was performed; that there was internal fixation with the plate and screws of a fracture of the calcaneus; that fixation devices "create some streak artifact here"; that the fracture line was "no longer distinctly visualized and appear[ed] to be united"; that the talocalcaneal joints appeared unremarkable; that no new fractures were identified; that no bony destruction was seen; and that no fracture lines were currently visible, "which is consistent with bony union." (Tr. 210).

Dr. Chalk's notes of March 30, 2004, state that the injection which Plaintiff received six weeks prior gave Plaintiff "a couple weeks relief into his subtalar joint"; that Dr. Chalk believed that there was a high likelihood of posttraumatic subtalar arthritis; that Dr. Chalk recommended subtalar arthrodesis to alleviate the Plaintiff's symptoms; and that Plaintiff received a prescription for Percocet. (Tr. 216).

On April 16, 2004, Plaintiff underwent surgery for "removal hardware right calcaneus" and "right subtalar arthrodesis with Allograft bone grafting." Dr. Chalk's report of this date states that he removed the screws and plate from Plaintiff's ankle and that a single 7.3 cannulated screw was placed superior to inferior across the joint into the calcaneus. Dr. Chalk's notes also state that Plaintiff had a "tobacco use disorder." (Tr. 218-23).

On April 29, 2004, Dr. Chalk reported that Plaintiff's wound was healing and that he placed Plaintiff in a short leg cast. (Tr. 216). In May 2004 Plaintiff was prescribed Vicodin and Darvocet. (Tr. 216). On May 27, 2004, Dr. Chalk reported that Plaintiff's incision had healed completely; that radiographs showed good alignment; and that Plaintiff was placed in a boot; and that Plaintiff could advance to full weight bearing over the next two weeks. (Tr. 215).

Dr. Chalk's records of July 8, 2004, reflect that Plaintiff was seen for an evaluation; that Plaintiff had minimal swelling and excellent range of motion; and that radiographs of Plaintiff's heal showed fusion. (Tr. 215).

Dr. Chalk's records of August 24, 2004, reflect that Plaintiff reported discomfort on the plantar aspect of the heel; that Plaintiff had a plantar fascial spur; and recommended "Viscoheel's," foot and ankle strengthening, and Vioxx; and that Plaintiff was to return in two months. (Tr. 215). Records reflect that Plaintiff was prescribed Vicodin in July and August. (Tr. 215).

On October 26, 2004, Dr. Chalk reported that Plaintiff's ankle was well preserved; that Plaintiff reported tenderness in the deep heel area; that Plaintiff's Achilles mechanism was stretched out; that films showed "some lucency [] at the subtalar joint"; and that "the screw is dorsal neck to heel area and if anywhere it were to be prominent, it would be on the lateral side, which is not really where [Plaintiff] elicits his pain." (Tr. 214).

Dr. Chalk's notes of December 7, 2004, state that since Plaintiff's last visit he shot himself in the big toe with a .22; that the wound was healing well and did not involve the bone; that Plaintiff reported heel and subtalar pain over the lateral side of the foot; that Dr. Chalk recommended a CT scan of the subtalar joint to rule out nonunion; and that if the bone is "fused, observation may be the recommended treatment." (Tr. 214). Upon reviewing a CT scan completed on December 7, 2004, Dr. Chalk's impression was a subtalar fusion with a screw traversing the talus into the oscelcis and that "there appear[ed] to be loss of joint space and increased sclerosis. A definite bony union, however,[was] not identified." (Tr. 237).

On December 13, 2004, Dr. Chalk reported there were numerous areas of spot arthrodesis between the subtalar joint and that the "transversing screw does appear to acct the lateral cortex of the calcaneus and this may be causing some of his symptomology that he is currently experiencing

in the lateral foot." Dr. Chalk further reported that he recommended delaying screw removal for at least a year and that potential screw removal would be scheduled for early April. (Tr. 235).

On February 7, 2005, Dr. Chalk reviewed CT scans and radiographs and reported that they were "less convincing that solid arthrodesis was obtained." Dr. Chalk reported on this date that he there was a halo sign around a screw suggesting motion in that site; that he recommended the dorsal to planar screw removed and "two screws placed from plantar-to-proximal, with possible additional injectable bone grafting"; that he recommended an exigent bone stimulator; and that Plaintiff complained of a mass over the posterior aspect of the left shoulder, which mass appeared to be superficial. (Tr. 240).

Records of St. John's Mercy Hospital reflect that on March 4, 2005, Dr. Chalk removed the screw in Plaintiff's right foot and reinserted two compression screws; that when operating on the heel, Dr. Chalk removed a cloudy fluid near the anterior aspect of the ankle; that Dr. Chalk inserted two screws into the heel; and that Dr. Chalk decided not to do bone grafting because of the "somewhat concerning fluid obtained and the previous screw removal." (Tr. 238).

Dr. Chalk's notes of March 17, 2005 reflect that Plaintiff reported on this date that his pain felt better; that cultures from the screw site were negative; that Plaintiff was placed in a partial weight bearing short leg cast; and that Plaintiff was told to continue to use the bone stimulator until further notice. (Tr. 249).

Dr. Chalk's notes of April 19, 2005, state that Plaintiff reported that his foot felt better than it had in a significant period of time; that radiographs showed good alignment and position; and that Plaintiff was placed in a boot. (Tr. 249).

In a letter dated June 6, 2006, to Plaintiff's counsel Dr. Chalk wrote that Plaintiff "has been unable to maintain employment and has had heel pain over the last three and a half years that has kept

him out of work since that time"; that Plaintiff was last seen on May 31, 2005 and stated his foot was feeling much better than it has previously; that Plaintiff had minimal tenderness of the sinus tarsi, walked with a non antalgic gait, and radiographs revealed healing and fusion of his arthrodesis; that Plaintiff was instructed to wean out of his boot into normal shoe wear; that Dr. Chalk believed that Plaintiff will be able "to return to some type of work"; and that working on irregular surfaces, roofs, and slanted surfaces would be impossible for Plaintiff. (Tr. 248).

## IV.
## DECISION OF THE ALJ

After considering the evidence of record, the ALJ concluded the Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (Tr. 21). The ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended onset of disability date. (Tr. 22).

The ALJ found that Plaintiff's impairment had more than a minimal effect on his ability to perform work-related functions and was therefore "severe" within the regulatory definition. (Tr. 16). Then the ALJ noted Plaintiff's alcohol and tobacco use, along with his chronic lower back strain and stated that these alleged impairments could be corrected or controlled by treatment. (Tr. 16). Therefore, the ALJ found that the impairments had less than a minimal effect upon Plaintiff's ability to perform work related functions, and consequently, are "non-severe" within the regulatory definition. (Tr. 16).

Next, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or equaled any criteria contained in the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4. (Tr. 16). Specifically, the ALJ found that Plaintiff was able to ambulate effectively as required by Listing 1.00(B)(2)(b), and did not meet the severity requirement of any other listing. (Tr. 16).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"). The ALJ found that Plaintiff has the RFC to lift a maximum of 20 pounds, frequently lift 10 pounds, and that he can stand or walk for six hours of an eight hour day. (Tr. 20).

The ALJ did not find Plaintiff to be credible because he found that: (1) the medical history, medical records and other evidence of record did not support the nature, intensity and persistence of his alleged pain, (2) Plaintiff regularly rides his bike long distances, (3) Plaintiff is capable of walking 5 miles, (4) that he went arrowhead hunting, (5) Plaintiff worked until September of 2003, (6) Plaintiff smokes a half a pack of cigarettes a day, (7) Plaintiff made no effort to stop smoking after told that smoking would hinder his healing process, (8) there are no reports from any acceptable medical source stating that claimant is unable to work or is disabled, and (9) Plaintiff applied for Unemployment Benefits in the fourth quarter of 2002 and applied for and received Unemployment Benefits into the first quarter of 2004. (Tr. 19). For these reasons the ALJ concluded that the record as a whole does not support a finding that Plaintiff's impairments are as limiting as he alleges. (Tr. 21).

Based on the RFC determination, the ALJ found Plaintiff is unable to perform his past relevant work, as that work was semi-skilled work performed at a medium or heavy exertional capacity. (Tr. 21). The ALJ found Plaintiff was a "younger individual," with a high school education, semi-skilled work experience performed at a medium exertional capacity, and transferrable work skills. (Tr. 21). Based on Plaintiff's residual functional capacity and his vocational profile, the ALJ determined Plaintiff would be able to make a successful vocational adjustment to work which exists in significant numbers in the national economy. (Tr. 21). Accordingly, the ALJ concluded the Plaintiff is not under a "disability," as defined by the Act. (Tr. 21).

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § § 416.920(f), 404.1520(f). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person's with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden  of production

shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) (holding that at Step 5 the burden of production shifts to the Commissioner, although the Commissioner is to required to reestablish the RFC which the claimant must prove at Step 4). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Eichelberger, 390 F.3d at 590-91.

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is

supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted).  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).  The plaintiff has the burden of proving

that he has a disabling impairment.  42 U.S.C. § 423(d)(1); <u>Pickner v. Sullivan</u>, 985 F.2d 401, 403 (8th Cir. 1993); <u>Roach v. Sullivan</u>, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).  When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

<u>Baker v. Sec'y of Health and Human Servs.</u>, 955 F.2d. 552, 555 (8th Cir. 1992); <u>Polaski</u>, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. <u>Id.</u> The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing.  <u>Id.</u>; <u>Cruse</u>, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841(8th Cir. 1992); <u>Ricketts v. Sec'y of Health and Human Servs.</u>, 849 F.2d 661, 664 (8th Cir. 1990); <u>Jeffery v. Sec'y of Health and Human Servs.</u>, 849 F.2d 1129, 1132 (8th Cir. 1988).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he

considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 426 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ

discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ concluded that Plaintiff retains the RFC to perform a significant range of light exertional work; because the ALJ did not take testimony from a licensed vocational expert; because the ALJ did not propose a hypothetical to a vocational expert which included all of Plaintiff's "true complaints and limitations"; and because the ALJ made an "unfair and inappropriate credibility assessment."

**A. Residual Functional Capacity**:

The ALJ found that Plaintiff has the RFC to perform a significant range of light and sedentary work. The ALJ noted that light exertional work requires a maximum of lifting twenty pounds, a frequent lifting of ten pounds, and standing or walking for six hours out of an eight-hour day. See 20 C.F.R. §416.967(a); SSR 83-10, 1983 WL 31251,*6 (SSA) ("Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."). 20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of

walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work." Id. at 997 (citing 1996 WL 374185 at *7). Plaintiff contends that the ALJ finding regarding Plaintiff's RFC is not supported by substantial evidence.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. A "'claimant's residual functional capacity is a

medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir.2005) (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004).

At step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has recently held in Eichelberger, 390 F.3d at 591, as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. Pursuant to this requirement, the ALJ found that Plaintiff's subjective complaints were not credible because they were inconsistent with his medically determinable impairments. The ALJ further found that Plaintiff's functional limitations included lifting no more than 20 pounds and standing or walking for six hours out of eight hours. Only after carefully reviewing the medical evidence and other evidence on record did the ALJ conclude that Plaintiff's restrictions do not preclude him from engaging in light exertional work.

In support of his argument that the ALJ's finding in regard to Plaintiff's RFC is not supported by substantial evidence Plaintiff argues that there is no indication from a doctor that Plaintiff has the ability to stand for six hours in an eight hour day. Plaintiff relies, in part, on medical records of September 30, 2003,which state that Plaintiff has aggravated pain on uneven surfaces and when walking on concrete and that Plaintiff should keep weight off his foot and keep it elevated. Records of this same date, however, state that Plaintiff was released for work on October 2, 2003. Thus, the doctor's instructions to rest and elevate Plaintiff's foot applied to the brief period from September 30 to October 2, 2003. Additionally, x-rays of September 30, 2003 showed the joint outline was normal, that the metalic implants were internally fixing the calcaneus and fusing the talocalcaneal joint, and that there was no postoperative abnormality.

Plaintiff further relies upon Dr. Chalk's letter of June 6, 2005, which letter was submitted after the ALJ's decision. Plaintiff notes that Dr. Chalk reported in this letter that Plaintiff was "unable to maintain employment and has had heel pain over the last three and a half years that has kept him out of work since that time." The court notes that Dr. Chalk's statement is not accurate. First, Plaintiff's earnings record reflects that in 2002 he earned $2,681.88 and that in 2003 he earned $13,847.78. Second, Plaintiff testified at the hearing that the gap in his medical care from 2002 to 2004 was the result of his working during that period. Indeed, as stated above, Plaintiff worked prior to September 2003 and he was released to return to work on October 2, 2003, thus suggesting that he was not disabled prior to that date. Third, Plaintiff alleges that his disability onset date is September 1, 2003. Fourth, a physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). A brief, conclusory letter from a treating physician stating that the applicant is disabled, such as that submitted by Dr.

Chalk, is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). Fifth, Plaintiff applied for unemployment benefits during the period Dr. Chalk stated Plaintiff was unable to work. See Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991). ("A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work.").

Additionally, the facts upon which Dr. Chalk relied in his letter is consistent with the ALJ's finding that Plaintiff can engage in light and sedentary work as described above as the letter states that in May 2005 Plaintiff reported that his foot was feeling better and that he was having minimal tenderness. The letter also acknowledges that Plaintiff was walking with a non antalgic gait; that radiographs of May 2005 showed healing and fusion; and that Plaintiff was instructed to wean out of his boot into normal footwear. The with the exception that Dr. Chalk said that Plaintiff cannot work on concrete,[2] the restrictions imposed by Dr. Chalk in his June 6, 2005 letter are not

---

[2]    Dr. Chalk's statement regarding concrete is somewhat unclear. He said that Plaintiff's "restriction will be placed on working on concrete or non-irregular foreign" does not itself make sense. (Tr. 248).

inconsistent with the RFC which the ALJ assigned to Plaintiff as Dr. Chalk said that Plaintiff could not work on irregular surfaces, slanted surfaces, and roofs and that he could not engage in irregular ladder climbing. As stated above, limitations in climbing and balancing by themselves do not impact a claimant's ability to perform a broad range of sedentary work. Moreover, sedentary work requires only that a claimant be able to walk or stand for approximately two hours out of an eight-hour day.

Plaintiff also argues the ALJ failed to take into consideration the reports of Ms. Lisa Masek, a senior counselor and of K. Quinn who interviewed Plaintiff for purposes of completing a Disability report for the Social Security Administration. Plaintiff argues this evidence should be considered corroboration by a third party and should have been considered bt the ALJ. First, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995). Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted ... [and][an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal citations omitted); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

Second, the court notes that Ms. Masek and K. Quinn are not treating sources nor are they acceptable medical sources. As such, their opinions are not entitled to controlling weight. See Lacroix v. Barnhart, 465 F.3d 881 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1502, 416.902, 404.1502, 416.902, 404.1527(a)(2), 416.927(a)(2)). Second, K. Quinn's and Ms. Masek's conclusions are not inconsistent with the finding of the ALJ in regard to Plaintiff's RFC for light or sedentary work. In particular Ms. Masek concluded that Plaintiff has no exertional limitations; that he can occasionally

lift twenty pounds; that he can frequently lift ten pounds; and that he can stand and/or walk for at least two hours and sit for six hours in an eight hour day. K. Quinn made general observations that Plaintiff has no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing seeing, or writing although it was observed that Plaintiff walked with a pronounced limp. (Tr. 137). Significantly, subsequent to Ms. Masek's January 2004 review of Plaintiff's medical records and subsequent to K. Quinn's October 30, 2003 Disability Report, Plaintiff had surgery to repair his ankle. After his April 2004 surgery it was reported that screws were removed in March 2005 and new screws were inserted. In April 2005 Plaintiff reported that his foot felt better and as stated above, Dr. Chalk reported in June 2005 that Plaintiff had minimal tenderness and he was to be weaned from his boot.

Plaintiff contends that the ALJ improperly relied on a report prepared by Dr. Tippett pursuant to an orthopedic evaluation because Dr. Tippett conducted his evaluation five months prior to Plaintiff's right foot arthrodesis and bone grafting surgery and fifteen months prior to the insertion of compression screws into Plaintiff's right foot. The ALJ did consider Dr. Tippett's report of November 2003 which included a consideration of the symptoms which Plaintiff described to Dr. Tippett. The ALJ, however, considered Plaintiff's subsequent medical records which included records relevant to both of Plaintiff's surgeries and, in particular, records which reflect that Plaintiff tolerated the second procedure well.

Significantly, the ALJ noted that Dr. Tippett's report was completed shortly after Plaintiff's alleged onset date. He stated that he gave Dr. Tippett's clinical findings and medical opinions great weight. The ALJ, however, gave controlling weight to the opinions and records of Dr. Lusardi and Dr. Chalk because they are Plaintiff's treating doctors and because they are "consistent and current." "It is the ALJ's function to resolve conflicts among the various treating and examining physicians."

<u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. <u>Cunningham v. Apfel</u>, 222 F.3d 496, 502 (8th Cir. 2000)(citing <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir.1991); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir.1998)). As such, the court finds that the ALJ properly gave controlling weight to the opinions of Dr. Chalk and Dr. Lusardi.

The court notes that Dr. Chalk reported in July 2004 after Plaintiff's second surgery that he had minimal swelling and excellent range of motion and that radiographs showed fusion of the heal; Dr. Chalk reported in August 2004 that Plaintiff should have foot and ankle strengthening; that Dr. Chalk reported in December 2004 recommended delaying screw removal; that in March 2005 Dr. Chalk removed the screw in Plaintiff's right foot and reinserted two compression screws; that on March 17 and April 19, 2005, Plaintiff reported to Dr. Chalk that his pain was better; that Dr. Chalk noted in April 2005 that radiographs showed good alignment and position; and that Dr. Chalk reported in his June 2006 letter that Plaintiff said in May 2005 that he was feeling much better, that examination showed minimal tenderness, and that radiographs showed healing and fusion of the arthrodesis.

To the extent the ALJ did not specifically refer to certain medical records relevant to Plaintiff's allegations of disability, including medical records subsequent to Plaintiff's second surgery, such an omission does not require a court to set aside an administrative finding when that omission had no bearing on the outcome. <u>Montgomery</u>, 69 F.3d at 275. Also, as stated above, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. <u>Moore</u>, 413 F.3d at 721 n.3; <u>Wheeler</u>, 224 F.3d at n.3; <u>Montgomery</u>, 69 F.3d at 275. In any case, the court finds that the medical records support the ALJ's determination of Plaintiff's RFC.

The court finds for the reasons set forth above that the ALJ's finding regarding Plaintiff's RFC is supported by substantial evidence on the record, including the records of Dr. Chalk and Dr. Tippett as well as Plaintiff's testimony at the hearing. Additionally, the decision of the ALJ in this regard is consistent with the applicable Regulations and case law.

**B. Licensed Vocational Expert:**

Plaintiff argues that the ALJ should have solicited the testimony of a vocational expert because Plaintiff has non-exertional limitations. The ALJ found that Plaintiff's complaints of pain were not credible and relied upon the Medical-Vocational Guidelines to determine that although Plaintiff is not capable of engaging in his past relevant work, other work exists in substantial numbers which work Plaintiff is capable of performing.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no non-exertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. Robinson, 956 F.2d at 839. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. Id.

The ALJ in the matter under consideration did not find that Plaintiff has non-exertional impairments. For the reasons fully set forth below and above, the court finds that the ALJ's determination to give Plaintiff's "statements contained in his medical records and his testimony little evidentiary weight" is supported by substantial evidence on the record. The court finds that substantial evidence supports the ALJ's decision that Plaintiff did not suffer from a disabling non-exertional impairment. As such, the ALJ was not required to utilize the assistance of a vocational expert. See Reynolds, 82 F.3d at 258. The court further finds, therefore, that the ALJ properly relied upon the Guidelines.

## C. Polaski Factors

Plaintiff contends that the ALJ's credibility findings are not based on substantial evidence. As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of an ALJ. Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Wheeler, 224 F.3d at 896 n.3; Reynolds, 82 F.3d at 258; Montgomery, 69 F.3d at 275. Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for an ALJ to make. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not

the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). For the following reasons, the court finds the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, Plaintiff argues that the ALJ should not have considered that Plaintiff rode his bike long distances and was capable of walking five miles because the cited events which took place prior to the onset of Plaintiff's disability. Upon choosing to discredit Plaintiff the ALJ considered that "the medical records indicate that [Plaintiff] regularly rides his bike and that he rides his bike long distances, he is capable of walking 5 miles, [and] going arrowhead hunting." The ALJ further considered that Plaintiff is capable of a wide range of daily activities and that his daily activities are inconsistent with his complaints of pain. Indeed, after Plaintiff's first surgery he was able to hunt squirrels as he shot himself in the foot in November 2004. Also, on December 6, 2003, which date is after Plaintiff's alleged onset date of September 1, 2003, Plaintiff reported that he could perform household chores including washing laundry, washing dishes, making beds, ironing, vacuuming, taking out the trash, home repairs and car maintenance. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel,

239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir.2005) (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit his complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Second, Plaintiff contends that the ALJ improperly considered that Plaintiff's use of a cane was self prescribed and that his prescription medications produced no side effects. Pursuant to Polaski, 739 F.2d at 1322, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987) (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain). The court finds, therefore, that the ALJ properly considered that Plaintiff's use of a cane is self prescribed and that he has no side effects from medication.

Third, Plaintiff argues the ALJ's finding that Plaintiff missed or canceled physical therapy and physician appointments is unreasonable. Plaintiff argues that the ALJ's determination is unreasonable because, in the year and a half between the onset of disability date and the hearing date, Plaintiff only missed one doctor's appointment and two physical therapy appointments. The ALJ found this evidence relevant to his credibility determination because the record shows that treatment generally was successful in controlling Plaintiff's impairment. An ALJ may properly consider that a claimant

cancelled medical appointments. Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain. Because there is evidence on record that Plaintiff did miss physical therapy and doctor's appointments and that treatment had been successful in controlling Plaintiff's impairment, the court finds the ALJ's consideration of Plaintiff's missed appointments is based on substantial evidence and that it is consistent with the Regulations and case law.

Fourth, Plaintiff argues the ALJ improperly considered that Plaintiff's failure to attempt to stop smoking suggests a less than whole hearted effort to fully recover from his impairment. Plaintiff argues that this rationale is speculative and unreasonable. The ALJ found it relevant that, after being informed by doctors that smoking would hinder his healing process, Plaintiff made no medically documented effort to stop smoking. Plaintiff cites evidence that he was "cutting back," as indicated on a progress note dated December 1, 2003. Indeed, a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain. Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). The court finds, therefore, that the ALJ properly considered that Plaintiff did not make an effort to stop smoking and that the ALJ's decision in this regard is supported by substantial evidence.

Fifth, Plaintiff argues his consistent work record supports his claims of disability. Indeed, a long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). However, as discussed above and as considered by the ALJ, applying for and/or receiving unemployment benefits suggests that a social security claimant is ready, willing and able to work. Thus, Plaintiff's applying for and receiving unemployment benefits negates his claim that he was

disabled.  See Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991).  See also Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997); Barrett v. Shalala, 38 F.3d 1019, 1023-24 (8th Cir. 1994).

Sixth, Plaintiff contends that the ALJ improperly considered that Plaintiff's treatment has generally been successful.  The record establishes that after his second surgery Plaintiff reported to Dr. Chalk that he was better and Dr. Chalk reported that there was healing and fusion of the arthrodesis.  Conditions which can be controlled by treatment are not disabling.  See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450.  The court finds, therefore, that the ALJ properly considered that Plaintiff's treatment was successful and that the ALJ's in this regard is supported by substantial evidence.

Seventh, the ALJ stated that there are no current reports from any acceptable medical source that the claimant can not work or is disabled.  Significantly, in his June 2005 letter Dr. Chalk stated that Plaintiff will be able to return to some type of work although vocational rehabilitation may be necessary for him to return to work involving ladders or slanted surfaces.  Moreover, no doctor opined throughout Plaintiff's medical history that he is unable to engage in any type of employment.  A record which contains no physician opinion of disability detracts from a claimant's subjective complaints.  Edwards v. Sec'y of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981).  The court finds, therefore, that the ALJ properly considered that no acceptable medical source opined that Plaintiff is unable to work and that the ALJ's decision in this regard is supported by substantial evidence.

## VII.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Brief in Support of Complaint is **DENIED;** Doc. 13

**IT IS FINALLY ORDERED** that a separate judgment be entered in the instant cause of action.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of December, 2006.